UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

JOACHIM P. AMADI,

               Plaintiff,

     v.

CONAGRA FOODS, INC., a Delaware
corporation, JOHN HUMBLE and BOB
RICH, individually and in their capacity as
supervisors,

               Defendants.

Case No. 3:11-cv-00858 -ST

OPINION AND ORDER

STEWART, Magistrate Judge:

      Plaintiff, Joachim P. Amadi ("Amadi"), filed this complaint against his former employer,

ConAgra Foods, Inc. ("ConAgra"), and two of his former supervisors, John Humble ("Humble")

and Bob Rich ("Rich").  He alleges two claims against ConAgra for employment discrimination

based on race in violation of Title VII of the Civil Rights Act of 1964, 42 USC § 2000e *et seq.*,

as amended ("Title VII") and 42 USC § 1981 (First Claim) and for unlawful employment

practices under ORS 659A.030 (Second Claim), and alleges one claim against Humble and Rich

for intentional infliction of emotional distress ("IIED") (Third Claim).

      This court has jurisdiction under 28 USC § 1331 based on the First Claim and

supplemental jurisdiction over the Second and Third claims under 28 USC § 1367.  All parties

have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c).

Defendants have filed a Motion for Summary Judgment against each of Amadi's claims (docket # 26).  For the reasons that follow, the motion is GRANTED as to the Third Claim alleging an intentional infliction of emotional distress and otherwise is DENIED.

## STANDARDS

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law."  The moving party must show an absence of an issue of material fact.  *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986).  Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial."  *Id* at 324, citing FRCP 56(e).  The court must "not weigh the evidence or determine the truth of the matter, but only determine[] whether there is a genuine issue for trial."  *Balint v. Carson City*, 180 F3d 1047, 1054 (9th Cir 1999) (citation omitted).  A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact.  *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).  The substantive law governing a claim or defense determines whether a fact is material.  *Addisu v. Fred Meyer, Inc.*, 198 F3d 1130, 1134 (9th Cir 2000) (citation omitted).  The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party."  *Farrakhan v. Gregoire*, 590 F3d 989, 1014 (9th Cir 2010), citing *Anderson v. Liberty Lobby, Inc.*, 477 US 242, 255 (1986).

///

///

## UNDISPUTED FACTS

### I.    Early Employment

Amadi was hired as a general laborer at ConAgra's plant in Weston, Oregon, in May of 2001. Humble Aff., [1] ¶ 2. Throughout his employment, he was the only black, Nigerian man working at that plant. Villarreal Decl., ¶ 3.

In 2002, Amadi was moved to a position in the Sanitation Department and was supervised by Rich. Amadi Depo., pp. 21, 24-25. Rich often imitated Amadi's Nigerian accent, embarrassing him, and when Amadi asked him to stop, he just laughed and walked away. *Id*, pp. 21, 25, 26, 66, 389-91. Although Amadi did a good job as a sanitation worker, Rich was never satisfied with his work. *Id*, pp. 26, 389; Rich Depo., p. 63.

On April 25, 2003, Amadi was slapped in the face by a co-worker named Patrick. Amadi Depo., p. 106. When Amadi reported this incident, Rich stated that it was Amadi's fault by pushing Patrick and defended Patrick by explaining that he "was white, that . . . you guys come from other places to try to dominate them with the jobs here." *Id*, pp. 106-08.

In 2004, Amadi moved to the Quality Control Department, in part to escape working for Rich. *Id*, pp. 66, 215, 389-91. From 2005 until 2008 he was supervised by Humble, the Quality Assurance ("QA") Manager, who promoted him to a lead position. *Id*, pp. 30-31; Humble Decl., ¶ 5. Amadi and Humble had a good working relationship until Humble made a comment comparing the "stinking like shit" smell of Amadi's boots to the smell of a black woman with whom Humble was sexually intimate.[2] Amadi Depo., pp. 33-34. Amadi complained to the

---

[1]   The parties have submitted documents with various attachments. Citations to affidavits, declarations, and depositions are identified by the last name of the affiant, declarant, or deponent, and citations are to the paragraph(s) of the affidavit or declaration or to the page(s) of the deposition transcript.
[2] Amadi could not identify a precise date but confirmed that this occurred while he was QA lead between September 2005 and August 2006. Amadi Depo., p. 38.

Human Resources ("HR") department on some unidentified date about that racial remark.  *Id*, p. 34.  After that point, Amadi began to withdraw from the friendship because he found the racial jokes to be too hurtful.  *Id,* p. 35.

## II.    **Production Supervisor**

In August of 2006, based on Humble's recommendation, Robert Tiberino, the Production Manager, promoted Amadi to a Production Supervisor position over two other Caucasian employees.  *Id*, pp. 56, 58-59.

On August 7, 2007, Tiberino gave Amadi his fiscal year 2007 performance evaluation ("2007 PMP").  Defendants' Ex. F.  He rated Amadi's overall performance as "meets," but noted that he needed to be "accountable for the things that occur on your shift" and to improve his decision making.   *Id*, pp. 5-7.  Those critical comments were similar to those given to other supervisors at that time.  Amadi Depo., pp. 74-75.

In December of 2007, Amadi sold a car to Humble's step-daughter.  *Id*, pp. 46-48.  Humble got upset when Amadi told him that he had not received payments for two months.  *Id*, p. 48.  To avoid workplace problems, Amadi told Humble not to worry about the balance due.  *Id*, pp. 46-49.  After that, Humble stopped talking to Amadi, and his entire attitude changed.  *Id*, pp. 48-49, 121, 197-98.

In about December 2007,[3] Tiberino completed a mid-fiscal-year 2008 performance review ("Mid-2008 PMP") which counseled Amadi as follows: "If you take these suggestions I have made and work on them you will improve.  This is up to you if you want to improve, [I] will be more than willing to work with you to help you succeed however you need to be willing to make these improvements."  Defendants' Ex. G, p. 7.

---

[3]  This exhibit has no date.  However, ConAgra's fiscal year ends on June 30.  Therefore, the mid-fiscal-year review likely occurred in December, as did the one for mid-fiscal-year 2009 (Defendants' Ex. L).

At the end of 2007, Linda Villarreal ("Villarreal"), the HR Manager, realized that Jeff Brasch, the plant manager, Humble, and Rich were trying to get rid of Amadi. Villarreal Decl., ¶ 2. Amadi never worked directly for Brasch since only the department managers reported to the plant manager. Plaintiff's Ex. S; *see* Humble Depo., pp. 44-45.

## III.    Sanitation Supervisor

On February 18, 2008, Amadi arrived at work to find a memorandum posted to the entire plant stating that he had been transferred to the position of Sanitation Supervisor and that he "has a big challenge ahead of him to meet sanitation goals." Amadi Depo., pp. 76, 80, 91-92; Plaintiff's Ex. B ("Restructuring Memo"). Villarreal describes this change as "out of the blue." Villarreal Decl., ¶ 4. There was no prior discussion with Amadi, no warning, and no solicitation of feedback from him; he found out at the same time as the other employees at the Weston plant. Amadi Depo., p. 80. It was not the standard practice to announce major job changes without any prior notice to the employee. Humble Depo., pp. 21-22; Villarreal Decl., ¶ 5.

According to Brasch, the decision to move Amadi into the Sanitation Supervisor role was a collaborative decision with Humble and Rich. Brasch Depo., p. 40. However, both Rich and Humble deny any involvement in that decision. Humble Depo., pp. 25-26; Rich Depo., p. 29.

Amadi knew how to clean equipment from his years in the sanitation department, but being a supervisor was a very different job requiring training in the paperwork, especially with the new programs. Amadi Depo., pp. 22, 94, 110, 396-98. ConAgra Foods holds an annual meeting for sanitation managers that Amadi wanted to attend to learn the Sanitation Gap Analysis program. *Id*, pp. 112, 114, 116-17; Rich Depo., p. 24. Humble did not select Amadi,

stating that "I'm taking the white boy to his first training."  Amadi Depo., p. 114.  Kyle Fuller, a white man of lesser rank, attended that training.  *Id*, pp. 114, 116; Humble Depo., pp. 60-61.

Villarreal questioned the decision and asked Humble and Brasch why Fuller was attending and not Amadi.  Villarreal Decl., ¶ 15.  Brasch told her to mind her own business.  *Id*.  At another point, Brasch told her to fire Amadi, but she refused because there were no grounds.  *Id*, ¶ 14.

In early 2008, Amadi attended training in Russellville, Arkansas, on current cleaning procedures.  Amadi Depo., pp. 97-98.  However, that training was not up-to-date and not geared towards managing the sanitation department.  *Id*, pp. 98, 101.

Soon after Amadi became Sanitation Supervisor, major changes were made in the department that displeased the crew.  Villarreal Decl., ¶ 6.  Though Amadi did not make these changes, the employees held him responsible.  *Id.*  The number of hours per employee was reduced, and several sanitation crew employees were eliminated.  *Id*; Amadi Depo., pp. 152-53, 155, 186; Feliciano Depo., p. 45.   Employees were no longer permitted to work overtime, which reduced their ability to complete the cleaning.  Amadi Depo., pp. 152, 155, 230-31.

These changes created immediate tension between Amadi and his crew.  Villarreal Decl., ¶ 7.  However, neither Brasch, Humble nor Rich supported Amadi.  *Id.*  The employees complained about Amadi to the union and Rich.  *Id*, ¶ 9.  Amadi was unable to give overtime for his crew without being criticized for it on his evaluations.  Amadi Depo., pp. 230-31.  In contrast, when other supervisors filled in for Amadi, they gave overtime without any repercussions from management.  *Id.*  Amadi was criticized when he failed to discipline employees (Defendants' Ex. I) and then criticized when he did (Amadi Depo., p. 238, Plaintiff's Ex. H, p. 3).

During this time period, two of Amadi's cars were damaged while parked at the Weston plant. *Id*, pp. 150-53, 157-60. Humble remembers "hearing something about that" and recalls discussing it with Tiberino who contacted the Weston City Police. Humble Depo., pp. 73-75. However, Tiberino does not recall the incidents or calling the police for any reason related to the Weston plant. Tiberino Depo., pp. 47-48.

Around June 2008, after a sanitation crew employee complained about Amadi's verbal and psychological attacks (Defendants' Ex. J), Brasch instructed Villarreal to draft a Focused Development Plan ("FDP") for Amadi. Humble Depo., pp. 78-80. However, he gave Villarreal no specifics as to what it should include. Villarreal Decl., ¶ 17. She refused because she had no factual basis for such a plan. *Id.* Later, Humble instructed Villarreal what to write in the FDP, and she did so. *Id*, ¶ 18. Villarreal felt that Brasch and Humble were not following the usual HR protocol. *Id.* When she confronted Brasch with her concerns about how Amadi was being treated, he just looked at her "with a smirky smile." *Id*, ¶ 19.

The FDP was signed by Amadi and Humble on June 10, 2008. Defendants' Ex. K. It noted deficiencies in effective communication and timely completion of required records. *Id.* Amadi was "perceived to be inflexible and uncooperative," did not know what and when records should be completed, and had not provided leadership in training his crew. *Id*, pp. 1-2. Amadi did all that was asked of him by the FDP. Villerreal Del., ¶ 20; *see also* Amadi Depo., pp. 206-07.

In Amadi's mid-fiscal-year 2009 evaluation dated December 17, 2008 ("Mid-2009 PMP"), Humble again identified several deficiencies: problem solving skills with employees, accountability on shift and proactivity in taking action; improve communication; and willingness to hold crew accountable for cleanliness and timeliness of the area. Defendants' Ex. L. Amadi

did not agree with those criticisms and believed that Humble wanted Fuller to replace him. Amadi Depo., pp. 221-23; Plaintiffs' Ex. H, p. 2.

In early 2009, Rich became the manager of the Sanitation Department and threateningly told Amadi: "You work[ed] for me before, [now] you're going to work for me again." Amadi Depo., pp. 269-70. Amadi believed Rich did not like him. Plaintiff's Ex. H.

Rich did not provide any hands-on training for Amadi even though he knew a great deal about sanitation and managing the department. Amadi Depo., p. 105; Rich Depo., pp. 99-100. When Amadi tried to ask questions or discuss issues with him, Rich would only respond by mimicking his Nigerian accent and walking away. Amadi Depo., p. 105. Amadi reported the mimicking to Villarreal who also observed it. Villarreal Decl., ¶ 10. She spoke with Brasch about the derogatory mimicking, but he responded that Amadi was "too sensitive." *Id*, ¶¶ 10-11.

In May 2009, ConAgra sent Amadi to a supervisor skills training in Fresno, California, at its "Foundations of Leadership" program. Amadi Depo., pp. 119-20.

Sometime in 2009, Amadi's son was born, but Rich denied his request for leave. *Id,* pp. 314-15. Other supervisors were regularly given time off for the birth of a child. Feliciano Depo., p. 84.

In June of 2009, Rich gave Amadi his second fiscal year-end performance evaluation ("2009 PMP") which noted concerns similar to the Mid-2009 PMP. Amadi Depo., p. 256; Defendants' Ex. M. It cited a cleaning issue which had caused a delay in production. Defendants' Ex. M, p. 2; Amadi Depo., pp. 262-63. It also noted that Amadi had made no improvement in his problem-solving skills and was still not taking accountability for addressing employee conflicts. Defendants' Ex. M, p. 3. Conflicts and escalations continued during his shift. *Id*, p. 5. He also failed to initiate contact. *Id*, p. 6.

It is customary for managers to sit down and have a face-to-face conversation with supervisory employees to review performance evaluations. Villarreal Decl., ¶ 21. However, Rich did not discuss Amadi's performance evaluation with him and instead emailed it without any verbal counseling, discussion, or dialogue. Amadi Depo., pp. 268-69. It was highly unusual to email an annual review to a supervisory employee with no face-to-face discussion and inconsistent with the way other plant supervisors were treated. Villarreal Decl., ¶ 21.

Villarreal observed that Amadi was treated differently from other supervisors at the Weston plant because the management team was not nearly as critical of any other supervisor. *Id*, ¶ 12. She believed many of the criticisms lacked merit and were intended to force Amadi to quit. *Id.* Any feedback Villarreal offered to Brasch, Rich, and Humble regarding Amadi was rejected. *Id*, ¶ 16.

On June 16, 2009, Amadi, through Linda Villarreal, made a Code of Conduct complaint to ConAgra's corporate office concerning the treatment by Humble and Rich. *Id*, ¶ 23; Plaintiff's Ex. H. On July 21, 2009, more than a month later, Susan Blackwell ("Blackwell"), ConAgra's in-house counsel, called Amadi and set up a time to discuss his complaints. Blackwell Depo., p. 24. Blackwell spoke with Amadi on July 29, 2009, and determined he needed to provide more documentation and details before she would investigate his complaint. *Id*, pp. 28, 42.

The next day, July 30, 2009, Rich placed Amadi on a Performance Improvement Plan ("2009 PIP"). Amadi Depo., p. 256; Defendants' Ex. O. Rich explained that one of the catalysts was the third-party audit performed by Silliker, Inc., on July 9, 2009, at the request of a ConAgra customer. Defendants' Ex. N. Any score below 88% is considered failing, and sanitation received a score of 80%. *Id*, p. 5. None of the other eight audited departments received a score

lower than 96%. *Id*, p. 5. Amadi's 2009 PIP identified deficiencies in his performance and included specific expectations to meet, such as initiating weekly meetings with Rich to discuss performance. Based on weekly meetings with Amadi, Rich prepared a summary table of performance concerns. Defendants' Ex. P.

Also on July 30, 2009, Amadi left work for the emergency room, believing he was having a heart attack. Amadi Depo., pp. 305-07. Rich called the hospital's main line and asked to speak with Amadi to remind him that he would still be subject to the conditions of the 2009 PIP upon his return to work. *Id*, pp. 340-42. Amadi was placed on medical leave until approximately December 2009. *Id*, pp. 305-07. Around the same time, Amadi was diagnosed with anxiety related to work stress. Wagner Depo., pp. 63-64.

Villarreal was terminated from ConAgra foods in August of 2009. Villarreal Decl., ¶ 24. She believes that her attempt to guide Brasch, Rich and Humble to correct HR protocol was one of the reasons for her termination. *Id*.

## IV.    2010 Discipline Leading to Termination

Rich place Amadi on another PIP on June 17, 2010 ("2010 PIP"). Defendants' Ex. Q. Its primary concern was "The Plant Sanitation section of the recent Silliker Audit." *Id*, p. 1.[4] However, the most recent audit by Silliker was in February 2010 which gave high marks to the sanitation department. Plaintiff's Ex. N. According to Rich, the reference to the "recent Silliker Audit" was to the 2009 audit, not the 2010 audit. Rich Depo., pp. 195-96.

The 2010 PIP required Amadi to initiate weekly meetings with Rich to address specific weekly expectations for his performance which he had to meet in 60 days. At the weekly meetings, Rich would prepare a summary table of performance concerns. Amadi Depo., p. 319-

---

[4] The 2009 Silliker Audit was more intense than previous audits at the Weston Plant. Tiberino Depo., pp. 69-79.

20, 309; Defendants.' Ex. R.  Amadi did not find these meetings productive or helpful because Rich did not engage in any dialogue, gave no coaching or counseling, and offered no assistance or problem solving techniques even when Amadi would ask a direct question about his duties. Amadi Depo., pp. 403-04, 412-14.  Instead, Rich entered information on a spreadsheet listing complaints and then had Amadi initial it.  *Id*, p. 413;  Defendants' Ex. R.  Amadi met with Rich until September 23, 2010, past the 60-day deadline.  Defendants' Ex. R, p. 12.

If a department's performance was below expectations, then that deficiency would be reflected on that department manager's performance review.  Tiberino Depo.,  p. 20.  However, In July 2010, Brasch gave Rich a "meets" rating on his performance review in every area, including sanitation, despite his criticism of Amadi and his department for not performing. Plaintiff's Ex. P, pp. 2, 4, 9.  In that review, Rich stated that "as an entire management team, we dropped the ball in failing to have a plan in place to replace" Amadi.  *Id*, p. 7.

Also in the summer of 2010, Rich, though working on the day shift, observed the plant at night during Amadi's shift.  He hid from him, but Amadi knew he was there.  Amadi Depo., pp. 328-30;[5] Rich Depo., pp. 171-72.  Humble agreed that such behavior would not be appropriate.  Humble Depo., p. 98.

On August 10, 2010, Amadi made a second discrimination complaint to the ConAgra Corporate Office.  Amadi Decl., ¶ 1.  On August 30, 2010, Blackwell again traveled to the Weston plant.  Blackwell Depo., pp. 50-52.  Prior to her visit, she only spoke with Tiberino, the acting plant manager, to discuss logistics.[6]  *Id*, pp. 51-52.  When she arrived at the plant, she met

---

[5]  These pages are referenced by the parties, but are missing from the record.
[6]  Tiberino temporarily filled in as plant manager for Brasch and had not been present for most of the performance issues that occurred prior to 2010.  Tiberino Depo., p. 13.

with Tiberino, Rich, the HR manager, Jeff Horn, and Tony Garcia, but did not meet with Amadi. *Id*, pp. 52-53.

Blackwell talked with Amadi about his discrimination complaint on September 23, 2010. Amadi Decl., ¶ 3.  She asked Tiberino to follow up with some individuals identified by Amadi as witnesses of the discrimination.  Blackwell Depo., p. 59.  The complaint was closed on September 30, 2010, without any finding of discrimination.  *Id*, p. 70.

On October 4, 2010, Amadi did not go to work due to hypertension, high blood pressure and anxiety.  Amadi Decl., ¶ 4.  After arriving at the hospital, he received a telephone call from Blackwell informing him that she had closed his complaint.  *Id*, ¶ 5; Blackwell Depo., pp. 71-72. On the same day, Amadi was called to a meeting at the plant.  Amadi Decl., ¶ 7.  The following day, he met with Rich and was terminated.  *Id,* ¶ 19. Rich terminated Amadi because he "failed to meet performance expectations."  Plaintiff's Ex. G.

## V.    Post-Termination

Rich and Humble claim there were procedural problems in the Sanitation Department during Amadi's tenure as supervisor that he did not resolve.  Rich Depo., pp. 200-01; Humble Depo., pp. 83-84.[7]  After Amadi's termination, however, no changes were made in the Sanitation Department, and yet, according to Rich, the department is doing "very good."  Rich Depo., pp. 178-79.

Ruiz worked in the Sanitation Department before and after Amadi's termination.  Ruiz Decl., ¶ 1.  She noticed that after he left, there was no problem with bacteria although they had not changed any procedures.  *Id*, ¶¶ 3, 5.  She suspected that the plant had been clean despite

---

[7] These pages are referenced by the parties, but are missing from the record.

Rich's complaints about Amadi. *Id*, ¶ 4. In fact, after Amadi left, the employees cleaned for less time, with less effort, and with fewer chemicals. *Id*, ¶ 7.

Ruiz noticed that the cleanliness of the Sanitation Department was deemed inadequate only when Amadi was supervisor and became less important after his termination. *Id*, ¶ 8. For instance, when Amadi was supervisor, Rich and another employee would check everything for mistakes. *Id*, ¶ 11. After Amadi left, the sanitation crew was not watched as closely, and any mistakes were not taken as seriously. *Id*, ¶ 12. In addition, the sanitation crew was given plenty of time to complete its work and was not prohibited from using overtime hours. *Id*, ¶ 14.

## DISCUSSION

### I.    Race Discrimination Claims

Amadi alleges claims of race discrimination under Title VII, § 1981 and ORS 659A.030. For discrimination claims under those three laws, "the substantive analysis is . . . the same." *Campbell v. Knife River Corp.-Northwest*, 783 F Supp2d 1137, 1147-48 (D Or 2011). "Additionally, the Ninth Circuit recently confirmed that the burden-shifting framework of [*McDonnell Douglas v. Green*, 411 US 792, 802-03 (1973)] applies to ORS 659A.030 claims tried in federal court. . . ." *Id*, citing *Dawson v. Entek Int'l*, 630 F3d 928, 935 (9th Cir 2011).

"To establish a prima facie case [of discrimination], a plaintiff must offer evidence that give[s] rise to an inference of unlawful discrimination." *Whitley v. City of Portland*, 654 F Supp2d 1194, 1207 (D Or 2009), quoting *Godwin v. Hunt Wesson Inc.*, 150 F3d 1217, 1220 (9th Cir 1998)). A plaintiff can establish a prima facie case of discrimination in one of two ways: (1) by showing direct evidence of discrimination, and/or (2) by producing indirect evidence of discrimination. *Id*. Where there is direct evidence of discrimination, the *McDonnell Douglas*

burden-shifting framework does not apply. *Trans World Airlines, Inc. v. Thurston,* 469 US 111, 121 (1985).

### A.   **Direct Evidence**

Direct evidence is "'evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude . . . sufficient to permit the fact finder to infer that that attitude was more likely than not a motivating factor in the employer's decision.'" *Enlow v. Salem-Keizer Yellow Cab Co., Inc.,* 389 F3d 802, 812 (9th Cir 2004) (emphasis omitted), quoting *Walton v. McDonnell Douglas Corp.,* 167 F3d 423, 426 (8th Cir 1999). It is "evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption." *Blikas v. Rest. Unlimited,* No. 3:09-CV-1324-AC, 2011 WL 5239749, at *12 (D Or Aug 18, 2011). "Direct evidence typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer." *Coghlan v. Am. Seafoods Co., LLC,* 413 F3d 1090, 1095 (9th Cir 2005). However:

> Not every comment about a worker's [race] is direct evidence of a discriminatory motive. "The Ninth Circuit has held a 'stray remark' that is 'uttered in an ambivalent manner and [is] not tied directly to [the plaintiff]'s termination is insufficient to create an inference of discriminatory motive.'"

*Blikas,* 2011 WL 5239749, at *12, quoting *Hartung v. Cae Newnes, Inc.,* 229 F Supp2d 1093, 1100 (D Or 2002), quoting *Merrick v. Farmers Ins. Group,* 892 F2d 1434, 1438-39 (9th Cir 1990).

Amadi argues that three comments by Humble and one comment by Rich constitute direct evidence of race discrimination.

///

///

1.    <u>**Humble's Comments**</u>

Amadi identifies at least three comments by Humble as direct evidence of his racial animus.  First, in late 2005 or 2006, Humble compared the smell of Amadi's boots to a black woman he had dated.  Second, commenting on the 2008 presidential election, he stated, "Can you imagine, the guy that is going to rule us is black?  This country is going down!"  Plaintiff's Ex. H, p. 3.  Third, in early 2008 Humble said he intended to take "a white boy to his first training," even though Amadi supervised that employee.  Amadi Depo., p. 114.   None of these comments qualify as direct evidence.

The first two comments are similar to the comments rejected as direct evidence of discriminatory intent in *Patterson v. Apple Computer, Inc.*, 2005 WL 2277005 (ND Cal Sept 19 2005).  In *Patterson,* those statements included:  (1) "African-Americans 'couldn't have a house party without shooting up the neighborhood;'" (2) "African-Americans are somehow involved in 'shooting up screens at movie theaters;'" and (3) "every time we [presumably referring to African-Americans] were interviewed on television they always seemed to get the person who's in curlers, missing teeth.'"  *Id* at * 11.  Although referring to race, all of these statements were general in nature and did not reference any employment decision concerning the plaintiff.  Similarly, the first two comments by Humble are about race in general, are not related to any employment action taken against Amadi and, thus, require an inference of racial animus.  *See Peters v. Shamrock Foods Co.*, 262 Fed Appx 30 (9th Cir 2007) (rejecting comment that a woman was not hired because she was a mom and would not want to travel as direct evidence of gender discrimination because it required the court to infer gender bias).

Moreover, both of these comments occurred at least two years prior to Amadi's termination and, as a result, are too far removed in time.  *Id* at 32 ("A single comment related to

a separate employment action made two years prior to [the plaintiff's] nonselection for the Food Service Sales Manager position is not direct evidence of discrimination.").

In contrast, the third comment relates to Amadi's employment as it affected his training and clearly is directed at Amadi's race. Whether a term, such as "boy," is evidence of racial animus, "the speaker's meaning may depend on various factors including context, inflection, tone of voice, local custom, and historical usage." *Ash v. Tyson Foods, Inc.*, 546 US 454, 456 (2006) (finding that "boy" is not always evidence of racial animus). Although defendants have not submitted any evidence as to the relevant factors of the tone, local custom and historical usage of the actual term "white boy" used by Humble, the comment is not direct evidence for several reasons.

First, as with the prior two comments, it is too remote in time to Amadi's termination.

Second, the referenced training was not relevant to Amadi's position. Humble and Fuller attended the Omaha training, and both explained that it included may topics aside from sanitation with no discussion of sanitation supervisory functions. Fuller Aff., ¶¶ 4-7; Humble Aff., ¶¶ 4-7. Besides, Amadi did receive other, more relevant training.

Third, during this period Amadi considered his relationship with Humble to be good. Humble promoted Amadi to the QA lead position, increasing his compensation and responsibility (Amadi Depo., pp. 29-31); he did not discipline Amadi while he was QA lead (Humble Aff., ¶ 5); he recommended him for the Production Supervisor position (Amadi Depo., p. 12); he advocated for a raise in 2008 after Tiberino gave Amadi a poor performance evaluation (*id*, pp. 136-27); they were at a time "good friends" (*id*, pp. 33-34 ); and several times in his deposition, Amadi stated that Humble was not a racist (*id*, pp. 124, 199-200, 277, 331, 352). These facts counter any alleged racial animus directed by Humble against Amadi.

### 2.    Rich's Comment

Rich commented to Amadi, early in his employment, that the reason a white employee slapped him was because "Patrick was white, . . .  you guys come from other places to try to dominate them with the jobs here . . ." Amadi Depo., p. 107.  This comment is not direct evidence of racial animus for two reasons.  First, it occurred nearly five years prior to Amadi's termination and, thus, is far too remote in time.  Second, Rich was not expressing his own opinion, but was trying to express the opinion of someone else.

### B.    Circumstantial Evidence

In the absence of direct evidence, a plaintiff must establish a *prima facie* case of race discrimination by showing that:  (1) he is a member of a protected class; (2) he performed his job adequately; (3) he suffered an adverse employment action; and (4) similarly situated individuals outside his protected class were treated differently.  *Cornwell v. Electra Cent. Credit Un.*, 439 F3d 1018, 1031 (9th Cir 2008).  Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its action.  *McGinest v. GTE Serv. Corp.*, 360 F3d 1103, 1122 n16 (9th Cir 2004).  If the defendant does so, then the plaintiff must show that the articulated reason is a pretext for discrimination.  *Id*; *Aragon v. Republic Silver State Disposal, Inc.*, 292 F3d 654, 658–59 (9th Cir 2002).

### 1.    *Prima Facie* Case

Defendants do not dispute that Amadi is a member of a protected class who suffered an adverse employment action.  As to whether Amadi was competently performing his job, defendants have submitted extensive evidence that Amadi's supervisors believed that he was not adequately performing his duties which eventually led to his termination.  However, Amadi contends that he was meeting the expectations of his job and disputes whether the discipline

culminating in his termination was warranted.  That dispute must be resolved at a later stage of

the analysis.  *Aragon*, 292 F3d at 660 (minimal *prima facie* showing regarding job performance

satisfied by employee's self-assessment of performance).

Defendants also contend Amadi cannot show that similarly situated employees outside

his protected class were treated differently.  "Individuals are similarly situated when they have

similar jobs and display similar conduct."  *Vasquez v. Cnty. of Los Angeles*, 349 F3d 634, 641

(9th Cir 2003).  Since Amadi was a supervisor when he was terminated, similarly situated

employees are other supervisors.  Prior treatment of Amadi as an hourly employee is irrelevant to

this issue, except to the extent that it evidences a continuing pattern of behavior by Rich after

Amadi became a supervisor.

Amadi has submitted evidence that he was treated differently as a supervisor.  Contrary

to accepted protocol, his job title and duties were changed without his input.  He was then denied

supervisory training that he lacked.  His managers (Rich and Humble) refused to speak with him

and did not follow HR protocol or usual policies of change of command procedures.  His

property was damaged twice while at the plant without any interventions or actions taken by his

manager or by the plant manager.  Rich made fun of him daily because of his Nigerian accent.

He was denied leave when his wife was in the hospital giving birth to his son.  He was emailed

his annual performance evaluation with no opportunity to discuss it with his manager Rich.  He

received more criticism than other supervisors without merit, and some of the criticized tasks

were the responsibility of other departments.  He could not authorize the use of overtime for the

sanitation department without it being held against him.  His report of foul play and sabotage

were ignored.  Rich spied on him in the middle of the night.  His complaints of discrimination

were not fully investigated.

Lastly, he has submitted evidence that other sanitation supervisors were not held to the same higher standard to which he was held.  In 2009, Feliciano was the QA lead who inspected the lines prior to the start of production to ensure they are clean and ready for operation. Feliciano Depo., p. 20.  Rich specifically requested that she take pictures to document any deficiencies she found during her morning checks.  *Id*, pp. 28-29.  Feliciano complied, but noticed the pictures were used to "attack" Amadi.  *Id.*  Each morning when he arrived, Rich asked Feliciano, "How did [Amadi] do last night?" even though the hourly sanitation crew employees performed the cleaning.  *Id*, pp. 29, 31-33.  Two lead employees under Amadi (Pablo Grimaldi and Kyle Fuller) also were responsible for checking areas for cleanliness after an area was cleaned by the sanitation crew.  *Id*, p. 70.  Even though these leads were in part responsible for sanitation, they were not disciplined for deficiencies.  Humble Depo., pp. 101-02.

When Amadi left July 30, 2009, on medical leave, Rich stopped asking Feliciano for the pictures and did not ask how his substitute was doing.  Feliciano Depo., pp. 33-34, 36, 80.  When she continued to provide pictures, Rich criticized her for nit-picking.  *Id.*  Feliciano did not notice any difference in the cleanliness of the plant or in the Sanitation Department's performance during her morning checks while Amadi was on medical leave.  *Id*, pp. 31-32. Nonetheless, Rich had no complaints.  *Id*, pp. 31-32, 68-71, 80.  The cleaning crew also noticed no differences during this time.  Ruiz Decl., ¶¶ 7-9.  The environment was much more relaxed for the cleaning crew when Amadi was gone because there was less or no criticism from Rich. *Id*.

After Amadi returned to work in December 2009, Feliciano noticed no change in the daily inspections of line or the cleanliness of the plant.  Feliciano Depo., pp. 69, 71.  However, Rich immediately began to complain about the performance of the Sanitation Department and

requested pictures of any deficiencies.  *Id,* p. 37.  He resumed asking Feliciano each day how

Amadi was doing.  *Id.*

Feliciano perceived that deficiencies in Amadi's sanitation performance appeared as if

someone had blatantly dirtied equipment after it had just been cleaned.  Feliciano Depo., p. 72.

Pictures showed a clean piece of equipment that appeared to have food deliberately thrown on it

after it had been cleaned.  *Id*, pp. 74-75; Plaintiff's Exs. L and M.   Feliciano suspected foul play.

Feliciano Depo., pp. 72-73.   When Amadi learned that an employee was throwing dough on the

line, he reported it to Rich, but it was not addressed.  Amadi Depo., pp. 280-82.

Feliciano also observed that Rich did not interact with Amadi, but would interact with the

sanitation leads (Pablo Grimaldi and Mario Juanquinde) supervised by Amadi.  Feliciano Depo.,

p. 79.  It appeared that they were discussing Amadi, outside his presence, in a sneaky and

vindictive manner.  *Id*, pp. 78-79.  Others on the sanitation crew also noticed that Rich often met

with the two leads and not Amadi.  Ruiz Decl., ¶ 6.  At the plant, information travelled through a

chain of command:  managers regularly discussed department issues with department

supervisors, who then discussed issues with department leads, who then instructed hourly

department employees.  Villarreal Decl., ¶ 25.  It was not typical to leave out the department

supervisor, and it was not the standard practice for a manager to discuss a supervisor's

performance-related issues with the employees working underneath the supervisor.  *Id*; *see also*

Humble Depo., pp. 88-89.  Feliciano never saw Rich interact in a nice way with Amadi, but

regularly observed him treating Amadi poorly.  Feliciano Depo., pp. 31, 77-78.

///

///

///

20 – OPINION AND ORDER

According to this evidence, Amadi was the only Sanitation Supervisor whose errors were being documented by photographs. In addition, while he was out on medical leave and after his termination, the Sanitation Department employees have been given plenty of time to do their work with more legitimate expectations. This is sufficient evidence to satisfy Amadi's *prima facie* burden.

### 2.    <u>Legitimate Non-Discriminatory Reason</u>

Defendants argue that their decision to terminate Amadi is supported by his poor performance evaluations. They also note that Amadi cannot meet the high burden imposed by the same actor inference.

### a.    <u>Job Performance</u>

Defendants have submitted evidence of poor job performance by Amadi. As early as the 2007 PMP, Tiberino noted Amadi needed to be accountable for what happens on the shift. Defendants' Ex. F. In Amadi's mid-year 2008 PMP, Tiberino indicated his willingness to work with Amadi to help him succeed. Defendants' Ex. G, p. 7. However, a few months after Amadi became Sanitation Supervisor, Humble placed him on a FDP, noting several deficiencies in his job performance related to lack of collaboration and accountability. Defendants' Ex. K. Although Amadi successfully completed the FDP, Humble again identified several of the same deficiencies in the Mid-2009 PMP. Defendants' Ex. L. After becoming Amadi's supervisor, Rich noted similar concerns in the 2009 PMP. Defendants' Ex. M. As a result, Rich placed him on the 2009 PIP in July 2009. Defendants' Ex. O. In June 2010, six months after Amadi returned from medical leave, Rich placed him on the 2010 PIP. Defendants' Ex. Q. Because Rich believed that Amadi's performance had not improved, Amadi was discharged on October 5, 2010. Defendants' Ex. G.

This documentation states that Amadi had persistent problems collaborating with other employees, accountability for his department, and meeting sanitation standards. This is sufficient to satisfy ConAgra's burden to show a legitimate non-discriminatory reason for terminating Amadi.

### 3.    Evidence of Pretext

Amadi contends that he was performing his job adequately and that defendants created illegitimate reasons to fire him. In support, he relies primarily on testimony by Villarreal, ConAgra's former HR manager, that Brasch, Humble, and Rich were trying to get rid of him since 2007. Villarreal Decl., ¶ 3. Her testimony also suggests that PIPs were manipulated since she was asked by Brasch to create one for Amadi when it was inappropriate. Villarreal Decl., ¶¶ 17-18. Moreover, in the 2010 PIP, Rich relied on the 2009 Silliker audit that identified problems with the Sanitation Department rather than the more recent, positive Silliker audit in February 2010. Ruiz also noted that more attention was paid in finding mistakes by Amadi as compared to other supervisors. Ruiz Decl., ¶¶ 11-12.

Amadi also points to strategic actions that made it difficult for him to succeed. He was moved to the Sanitation Supervisor position without his prior knowledge or input. He was denied training and support when he had questions. When there were unpopular changes to sanitation crew conditions, defendants allowed the crew to believe that Amadi made the changes, causing the crew to become unhappy and cast blame inappropriately on him. Rich and Humble were never happy with his progress, continually added more duties, undermined his authority by communicating with the leads working under him, and avoided HR protocol. They focused only on his mistakes and spied on him for documentation. In their eyes, he could do nothing right; he was criticized when he did not discipline an employee and then criticized when he did.

22 – OPINION AND ORDER

Because Humble advanced Amadi's career, defendants contend that there is a strong inference of no discriminatory motive. "[W]here the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory intent." *Bradley v. Harcourt, Brace, & Co.*, 104 F3d 267, 270-71 (9th Cir 1996). "The same-actor inference is neither a mandatory presumption (on the one hand) nor a mere possible conclusion for the jury to draw (on the other). Rather it is a 'strong inference' that a court must take into account on a summary judgment motion." *Coghlan v. American Seafood Co.*, 413 F3d 1090, 1098 (9th Cir 2005), citing *Bradley*, 104 F3d at 271. However, that strong inference does not apply here. Humble's promotions of Amadi occurred in 2005 and 2006, while Amadi was terminated years later in 2010 by Rich.

This evidence is sufficient to satisfy Amadi's burden that his critical performance reviews were pretext. Therefore, defendants are not entitled to summary judgment against the First and Second Claims alleging employment discrimination based on race.

## II.    Intentional Infliction of Emotional Distress

Under Oregon law, an IIED claim is subject to a two year statute of limitations. ORS 12.110(1); *see also Campbell*, 783 F Supp2d at 1157. Because Amadi filed his lawsuit on July 18, 2011, any comments allegedly causing his emotional distress must have occurred after July 18, 2009, to be actionable. These include his performance reviews, PIPs, and discharge as well as Rich and Humble's remarks and behavior towards him.

To prove an IIED claim under Oregon law, a plaintiff must establish: (1) the defendant intended to inflict severe emotional distress; (2) the acts were the cause of plaintiff's severe emotional distress; and (3) the acts were sufficiently grievous to constitute a transgression of the bounds of socially tolerable conduct. *See Delaney v. Clifton*, 180 Or App 119, 129–30, 41 P3d

1099, 1106 (Or App 2002). "The intent element of the claim does not require a malicious motive

or a purposeful design to inflict emotional distress on the plaintiff; it is satisfied if a defendant

either desires to inflict severe emotional distress, or knows that such distress is certain, or

substantially certain, to result from his conduct." *Id* at 132, 41 P3d at 1108 (internal quotation

marks omitted). "Whether the conduct alleged is sufficiently extreme or outrageous to be

actionable is a fact-specific inquiry, one to be made on a case-by-case basis considering the

totality of the circumstances." *Id* at 130, 41 P3d at 1106. "Whether conduct constitutes an

extraordinary transgression of the bounds of socially tolerable conduct is a question of law."

*Harris v. Pameco Corp.*, 170 Or App 164, 171, 12 P 3d 524, 529 (Or App 2000).

"Conduct that is merely 'rude, boorish, tyrannical, churlish and mean' [is insufficient to

be actionable, and] ... insults, harsh or intimidating words, or rude behavior ordinarily [do not]

result in liability even when intended to cause distress." *Watte v. Edgar Maeyens, Jr.*, 112 Or

App 234, 239, 828 P2d 479, 481 (1992), quoting *Hall v. The May Dept. Stores*, 292 Or 131, 135,

637 P2d 126, 129 (1984). In addition, IIED claims typically involve acts of psychological and

physical intimidation, racism, or sexual harassment. *See Babick v. Oregon Arena Corp.*, 333 Or

401, 40 P3d 1059 (2002) (defendant's release of intoxicated and violent concertgoers presented a

threat of imminent physical harm); *Kraemer v. Harding*, 159 Or App 90, 976 P2d 1160 (1999)

(continued accusations that a school bus driver was a child sex abuser after multiple

investigations found no inappropriate conduct); *Wheeler v. Marathon Printing, Inc.*, 157 Or App

290, 974 P 2d 207 (1998) (co-worker continued harassment including sexual remarks even after

plaintiff attempted suicide); *Lathrope-Olson v. Dept. of Transportation*, 128 Or App 405, 408,

876 P2d 345 (1994) (calling a Native American woman a squaw, telling her that a squaw was

supposed to walk behind her man, stating that all women were good for was between their legs,

locking her out of the work van in the rain and snow, and threatening to push her into the path of oncoming vehicles); *Mains v. II Morrow, Inc.*, 128 Or App. 625, 877 P2d 88 (1994) (daily physical assaults and sexual comments by supervisor); *Franklin v. Portland Community College*, 100 Or App 465, 787 P2d 489 (1990) (supervisor called an African-American male by the name "boy," issued false reprimands, shoved him, locked him in an office, and suggested that he apply elsewhere for employment).

Although this claim is alleged against both Humble and Rich, the most egregious conduct was by Rich. Rich regularly mimicked Amadi's Nigerian accent and made a threatening comment to him when again becoming his supervisor in 2009. Rich blatantly ignored Amadi's questions and showed his obvious dislike which other employees observed. When Amadi went to the emergency room for treatment, Rich took the unusual step of calling the hospital to remind him of work deficiencies. He denied Amadi medical leave for the birth of his child. He also spied on him and documented any mistake with a photograph. The culmination of this behavior was Amadi's diagnosis of anxiety.

Nonetheless, none of these actions, when considered as a whole, meet the very high standard of "an extraordinary transgression of the bounds of socially tolerable conduct." *Campbell*, 783 F Supp2d at 1157; *Franklin,* 100 Or App at 472, 787 P2d at 493. Mimicking his accent is certainly rude and insulting, but not socially intolerable. The other alleged conduct by Rich, although reprehensible in the workplace, is not nearly as egregious as the defendant in *Franklin* who used a racial epithet and physically assaulted the plaintiff by shoving him and attempting to lock him in a room. Amadi suffered no physical attacks nor was he ever placed in fear of imminent physical harm. *See Franklin,* 100 Or App at 472, 787 P)2d at 493. In sum, this

court concludes that, as a matter of law, the evidence is insufficient to support an IIED claim under Oregon law.

## **<u>ORDER</u>**

Defendants' Motion for Summary Judgment (docket # 26) is GRANTED as to the Third Claim alleging an intentional infliction of emotional distress and otherwise is DENIED. Accordingly, defendants John Humble and Bob Rich are dismissed, and only the First and Second Claims against defendant ConAgra Foods, Inc., remain for trial.

DATED July 27, 2012.

s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge